Filed 5/17/22  P. v. Penna CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MANUEL ANTHONY PENNA,<br><br>Defendant and Appellant. | C090573<br><br>(Super. Ct. No. 18FE016882) |

Defendant Manuel Anthony Penna appeals from his convictions for unlawful possession of ammunition, mayhem, battery, and assault stemming from incidents on two different dates.  In the first incident, defendant was alleged to have threatened his estranged wife, Theresa Doe (Theresa), who called 911.  Sheriff's deputies responding to the call eventually found defendant at his mother's house, and a subsequent search of the house's garage yielded multiple types of ammunition.  In the second incident, defendant got into a fight with T.J., during which defendant bit off one of T.J.'s fingers.

1

On appeal, defendant claims: (1) the trial court erred by failing to suppress all evidence seized during the search of the garage on the basis that he did not voluntarily consent to the search, (2) insufficient evidence supported his conviction for unlawful possession of ammunition, (3) the trial court abused its discretion by consolidating the charges from the two separate incidents, (4) the trial court erred by denying his motion pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 and his new trial motion, (5) his convictions for battery and assault must be vacated because they are merely different statements of the same offense as mayhem, and (6) his on-bail enhancement must be vacated.

In supplemental briefing, the parties agree that the case must be remanded to the trial court to consider the effect of newly enacted Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441, § 1) (Assembly Bill No. 518), which amended Penal Code section 654, and Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3) (Senate Bill No. 567), which amended Penal Code section 1170, subdivision (b).[1]

We agree with the parties that remand is required to consider the effect of Assembly Bill No. 518 and Senate Bill No. 567. However, we disagree with defendant's remaining contentions. Accordingly, we affirm defendant's convictions, and we vacate the sentence and remand to the trial court for resentencing.

## FACTS AND PROCEEDINGS

*Factual Background*

Defendant and Theresa began dating in 2002 and in 2005 they were married and their daughter Saleen was born. Defendant began dating other women after 2008. In 2017, Theresa and Saleen went to live at a transitional group home in Sacramento;

---

[1] Further undesignated statutory references are to the Penal Code.

Theresa worked at the home in exchange for lodging. Defendant worked at the home as a handyman, and he periodically went to the home to pick up Saleen for school and drop her off from school.

Some of the group home's tenants complained that they were afraid of defendant, and there were constant problems and arguments between defendant and Theresa. One witness testified at trial that Theresa had told her about an incident in May 2018 in which defendant hit her after accusing her of being romantically involved with another resident, leaving her with a knot or bruise on the top of her head. Sometime after that incident, the home's management stopped hiring defendant to do handiwork and prohibited him from being at the home.

At trial, the prosecution introduced evidence of multiple other uncharged instances of domestic violence that defendant had committed against Theresa and other women. For example, in March 2007, Theresa reported that defendant pushed her to the floor, poured soup on her head, smashed her in the head with the soup container, and dragged her down the hallway by her hair. That same night, a woman defendant was romantically pursuing came to the door, and defendant told Theresa to leave the house, pushed her to the floor, and pushed her down the stairs. In April 2008, Theresa reported that she attempted to leave the house, but defendant threatened her with a large barbecue fork and told her he would kill her if she left. In May 2008, Theresa said that defendant threatened to kill her, and she was afraid he would kill her if given the opportunity. In November 2008, with a restraining order in place, defendant threatened to force his way into Theresa's apartment, defendant and his brother came to the apartment, and defendant's brother kicked in her door. In July 2018, Theresa stated that defendant hit her in the arm with a wrench.

The prosecution also introduced expert testimony regarding domestic violence, specifically the "cycle of violence" and "intimate partner abuse." The expert discussed in part that victims of domestic violence often recant or deny that charges are accurate, and

3

women who are victims of domestic violence often remain in long-term relationships with their abuser.

Defendant testified that, despite multiple domestic battery convictions against at least three different women, he never physically abused a woman.

*Criminal Threat and Possession of Ammunition Charges*

On August 28, 2018, Theresa asked defendant to help discipline Saleen, who had dumped food all over the communal kitchen at the group home. After defendant arrived, Saleen told him that Adam, Theresa's new boyfriend, walked around in front of her without his pants on. Defendant kicked Adam's door in, looked for but could not find him, pushed his TV stand, and knocked items off his dresser. Defendant testified that Theresa mocked his response, and Theresa later stated on two 911 calls and in statements to Deputy Alex Lopez that defendant, with a semiautomatic handgun in his hand, grabbed her by the hair, pulled her into the living room, and shoved her head into the couch. Theresa told Lopez that defendant said he was "tired of this shit and he would shoot her." She said that defendant was a violent man, that she was fearful of him, and that he "does this all the time."

At trial, Theresa testified as a witness adverse to the prosecution. She did not recall calling 911, and she denied that defendant dragged her down the stairs, had a gun, or threatened her. She stated that she made up the story because she was irritated with defendant. Similarly, defendant testified that he did not touch Theresa, have a gun, or threaten her.

After Theresa provided her statement to him, Lopez "researched [defendant's] residence," gathered a team of deputies due to his belief that defendant may be armed, and went to the residence, which was located approximately one block from the group home. Lopez used a loudspeaker to order defendant to come out of the house. Defendant peacefully emerged, and deputies arrested him and put him in a patrol car. Deputies searched the garage attached to the house pursuant to defendant's consent and found

4

shotgun shells, .22-caliber rounds, .32-caliber rounds, nine-millimeter rounds, a nylon gun holster, and a nine-millimeter handgun magazine. Deputies also observed a working refrigerator with a picture of Saleen on it, a chaise lounge, men's clothing, miscellaneous tools, and other items of furniture.

Defendant's mother, Brenda Marshall, was aware that there was ammunition in the garage, and she testified that the set of .22-caliber rounds in the garage belonged to another son, who was deceased. She knew that her deceased son owned a rifle, and she first testified that she did not know if her deceased son owned a handgun before testifying that he did own handguns. She had not seen a handgun magazine in the property that she received after her son's death. She was unaware of any other rounds or shotgun shells in the garage. Defendant testified that the ammunition the deputies found in the garage "are between my brother -- my big brother and my little brother Abe and mine. I think they are mostly Abe's bullets, though. I'm not really sure. I don't know."

Marshall testified that she lived alone in the house but that defendant went there 20 to 22 days per month, primarily to work and hang out in the garage. He sometimes slept on a sofa bed in the garage, where there was a working TV. Other family members who visited from out of town would sleep in a bedroom in the house, not in the garage. Defendant denied living at his mother's house, although he "might have said" that he and his mother were the only two people there. He acknowledged spending a lot of time there and sometimes staying the night in the garage. Theresa testified that defendant lived at his mother's house, and an employee of the group home testified that defendant lived down the street from the home.

After the August 28 incident, a restraining order was issued. Defendant subsequently returned to the group home on several occasions because Theresa called him there.

5

*Mayhem, Battery, and Assault Charges (the Mayhem Case)*

T.J. moved into the group home in October 2018. He cleaned the home and helped to ensure that it was secure, including deciding who was allowed into the building. The home's management instructed T.J. that defendant was prohibited from entering the home, although defendant testified that he was never told that he could not go to the home and only stopped going due to the restraining order. T.J. testified that on November 6, 2018, defendant returned to the group home. He told defendant that defendant was not allowed to be there, and defendant started cursing at him and threatened to beat him. T.J. backed away and told defendant he did not want to fight. Defendant then walked about the group home as if he lived there. T.J. reported the incident to management, who advised him to record defendant's presence on video the next time he came. Defendant returned to the home two days later, and T.J. again told defendant he was not allowed to be there. Defendant responded angrily, pushed him, and threatened to beat him. T.J. tried to record the interaction with his phone, but defendant again pushed him and angrily knocked the phone out of his hand. T.J. was afraid of defendant and viewed him as "crazy."

T.J. testified that on December 7, he found defendant standing at the bottom of the stairs inside the home. He once again told defendant that defendant was not allowed there, and defendant yelled: "What you gonna do?" Defendant then ran up the stairs and punched him in the face, cutting his lip and loosening his tooth. Defendant continued punching him, and T.J. returned punches but did not recall if he landed any. Then T.J. attempted to put defendant in a headlock with his left arm. Defendant grabbed the pinky finger on T.J.'s left hand and put it in his mouth. T.J. tried to pull his finger out of defendant's mouth, but defendant bit his finger off. Defendant continued to try to bite T.J. and throw punches at him. T.J. attempted to fight back, but he could not. Theresa stood in between the men and attempted to hold T.J. back. T.J., Theresa, and defendant then fell down the stairs. Saleen handed defendant a wooden baseball bat, and defendant

6

held it above T.J.; he then lowered the bat and left the home. T.J.'s severed finger could not be reattached.

Defendant testified that he went to the group home to pick up Saleen and take her to school. He wanted to stay outside, but he had to go in to get gas money from Theresa. While at the bottom of the stairs, he noticed the lights turning on and off, and he saw T.J. standing at the top of the stairway. Defendant walked up the stairs, and when he reached the top of the stairs, T.J. pushed him against the wall with his finger in defendant's mouth and nose. Defendant stated that he was not sure what happened because he suffers from seizures, and he was "knocked out" or "dazed" from T.J.'s first or second punch, but that he believed T.J. put his finger in defendant's nose and two fingers in or near defendant's eye while pushing him against the wall. Because T.J. was tearing his nose, eye, and skin, defendant slowly bit T.J.'s finger. Defendant bit off T.J.'s finger and T.J. punched him, so defendant punched him back. Defendant testified that he was particularly sensitive to being hit in the face because he suffered an injury in 2012 requiring significant surgery on his face, and he was shot in the face in 2017, again requiring significant reconstructive surgery.

Theresa testified that she came out of the bathroom and saw T.J. flicking the light switch on and off. Theresa went back to her room, and she could hear defendant on the stairs asking Saleen to ask her for gas money. Theresa left her room and saw T.J.'s hands around defendant's neck, choking him. She tried to separate them, but T.J. hit her in the face and pushed her down the stairs. From the bottom of the stairs, Theresa saw Saleen go into her room and retrieve a baseball bat. Saleen handed defendant the bat, but Theresa ran up the stairs and took it from defendant. Defendant pushed T.J. away, but T.J. rushed him and bear hugged him from behind. T.J. then tried to "rip [defendant's] eyeballs," and he grabbed and pulled defendant's nose. T.J. started "stretching his face out," and defendant bit T.J.'s finger.

7

Saleen testified that she came out of the room and saw T.J. pushing defendant against a wall and holding him by the throat. T.J. then punched defendant about four or five times. Saleen got a bat and handed it to defendant, but Theresa ran up the stairs and took it from him. T.J. then shut the door, and Saleen did not see anything else. She then went down another staircase and saw T.J. hitting defendant and pulling on his face, and she saw defendant bite T.J.'s finger.

*Verdict and Sentence*

A jury found defendant guilty of unlawful possession of ammunition (§ 30305, subd. (a)(1); count two), mayhem (§ 203; count three), battery resulting in the infliction of serious bodily injury (§ 243, subd. (d); count four), and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count five). The jury found true the allegation that defendant personally inflicted great bodily injury in the commission of the assault. The jury was not able to reach a verdict as to the allegation of a criminal threat (§ 422, count one), and that count was later dismissed. The court found true the allegation that defendant committed the mayhem, battery, and assault offenses while released on bail. (§ 12022.1.)

The trial court sentenced defendant to the upper term of eight years on count three, plus a two-year enhancement for committing the offense while out on bail for a prior felony under section 12022.1. The court also sentenced defendant to the low term of 16 months on count two, to run concurrently. The court further imposed midterm sentences on counts four and five, and the enhancement to count five, the imposition of which the court stayed under section 654.

Defendant filed a timely notice of appeal. After numerous requested and granted extensions in both parties' briefing, the case was fully briefed in November 2021 and assigned to this panel on November 30, 2021. On April 19, 2022, defendant filed a notice of new authorities, and the case was argued on April 20. At oral argument and as we will explain, we allowed the Attorney General to file a supplemental letter brief and

8

defendant to file a supplemental reply letter brief. Supplemental briefing was concluded on May 3 and the matter was deemed submitted that same day.

## DISCUSSION

### I

*Motion to Suppress Evidence*

Defendant contends the trial court erred in failing to suppress all evidence seized in the search of the garage because the circumstances of his arrest, including the lack of *Miranda* warnings (*Miranda v. Arizona* (1966) 384 U.S. 436), rendered his consent involuntary. We disagree.

A. *Procedural Background*

Defendant filed a pretrial motion seeking to suppress a testimonial statement made after his arrest that he lived in the garage and his consent to search the garage on the basis that he had not been given his *Miranda* warnings at the time of the statements, and the circumstances surrounding his statement rendered his consent to search the garage involuntary. (§ 1538.5.)

Deputy Lopez testified at the hearing on the motion that he responded to Theresa's 911 call in August following defendant's alleged criminal threat. Defendant was not at the home when Lopez arrived, but Lopez conducted a records check, through which he concluded that defendant lived close by. Theresa did not recall defendant's address, but she described the residence and a specific vehicle in the driveway, and she told Lopez that defendant lived in the garage. Because Theresa told him that defendant was armed with a gun, Lopez gathered six deputies and went to defendant's residence to arrest him. The deputies were dressed in fully marked uniforms and were not wearing tactical gear. The deputies set up a perimeter around the front of the house, and the other deputies had their weapons out. Lopez ordered defendant to come out of the house using a loudspeaker. Defendant came out of the house peacefully, and he was arrested. At the time he was handcuffed, the other deputies did not have their guns drawn.

9

Without *Mirandizing* defendant, Lopez asked him if he lived in the garage, and defendant stated that he did. Lopez then asked defendant if there was a gun in the garage, and defendant answered, "there wouldn't be a gun." Finally, Lopez "asked him if he minded if [the deputies] searched the garage, and he answered something to the effect of 'go ahead.' "

Defendant testified at the hearing that the deputies wore full riot gear, including helmets and shields, and were armed with assault rifles. Defendant did not recall consenting to the search or telling Lopez that he lived in the garage, but he remembered being afraid and telling Lopez that he did not have a gun. Defendant acknowledged that Lopez did not yell or point a gun at him while asking him questions, but he asserted that the deputies had all previously aimed their guns at him.

The trial court ruled: "I do find that the consent -- I am satisfied with the testimony of Deputy Lopez. With regard to consent, I find Deputy Lopez to be credible. [¶] I also find that they were not in -- based on Deputy Lopez's testimony, the deputies were not in SWAT gear or riot gear or anything like that. It's not a critical distinction, but I just wish to make that factual finding. [¶] And based upon hearing the respective testimony of the two witnesses in this matter, I am satisfied that it was an uncoerced and fully consensual authorization to search the garage. It was a consented-to search, and, therefore, it does not violate the Fourth Amendment."

However, the trial court subsequently granted defendant's motion to exclude his statement that he lived in the garage because he made the statement in the context of a custodial interrogation without having received his *Miranda* warnings.

B. *Legal Background*

Warrantless " 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.' " (*Arizona v. Gant* (2009) 556 U.S. 332, 338.) The burden of justifying a warrantless

10

search, as in this case, falls upon the prosecution after the defense has made a prima facie case that there was no warrant.  (See *People v. Williams* (1999) 20 Cal.4th 119, 130.)  If the prosecution satisfies its burden of proving some justification for the warrantless search or seizure, the defendant may respond by pointing out any inadequacies in that justification.  (*Id*. at p. 136.)

One way for law enforcement to justify a warrantless search is to obtain a valid consent from a person who has the right to authorize the search.  (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219; *People v. Woods* (1999) 21 Cal.4th 668, 674; *People v. Tremayne* (1971) 20 Cal.App.3d 1006, 1015.)  Such consent must be freely and voluntarily given by a person who has authority over the target premises, requiring law enforcement to have an objectively reasonable belief that such apparent authority is valid before conducting a warrantless search.  (See *Illinois v. Rodriguez* (1990) 497 U.S. 177, 188; *People v. Jenkins* (2000) 22 Cal.4th 900, 974; *People v. Carreon* (2016) 248 Cal.App.4th 866, 876.)  "Where, as here, the prosecution relies on consent to justify a warrantless search or seizure, it bears the 'burden of proving that the defendant's manifestation of consent was the product of his free will and not a mere submission to an express or implied assertion of authority.' "  (*People v. Zamudio* (2008) 43 Cal.4th 327, 341.)

Whether a consent to a search was voluntary or rather was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.  (See *Schneckloth v. Bustamonte*, *supra*, 412 U.S. at p. 227; *People v. James* (1977) 19 Cal.3d 99, 106.)  "The question of the voluntariness of the consent is to be determined in the first instance by the trier of fact; and in that stage of the process, '[t]he power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court.  On appeal all presumptions favor proper exercise of that power, and the trial court's findings -- whether express or implied -- must be upheld if supported by substantial evidence.' "  (*James*, at

11

p. 107.)  "But where the undisputed facts clearly reveal that an apparent consent was not freely and voluntarily given but was in submission to an assertion of authority, a reviewing court is not bound by a finding of consent by the trial court."  (*People v. McKelvy* (1972) 23 Cal.App.3d 1027, 1033-1034.)  Factors to be considered in determining whether consent to search was voluntary include (1) whether the person consenting was in custody, (2) whether the arresting officers had their guns drawn, (3) whether *Miranda* warnings had been given, (4) whether the officer informed the person of his right to refuse consent, and (5) whether the person was told that a search warrant could be obtained.  (*People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1558.)

While the issue of the voluntariness of the consent is a question of fact reviewed for substantial evidence, "on appeal we independently determine whether the conduct involved in a search was constitutionally reasonable, 'whether the[] historical facts, viewed from the standpoint of an objectively reasonable police officer,' justified the search.  [Citations.]  'The constitutional precept of "reasonableness" as to searches and seizures is not a "fact" which can be "found" or not found in any given case.  Rather, it is a standard, a rule of law, external, objective and ubiquitous, to be applied to the facts of all cases.' "  (*People v. Carreon, supra*, 248 Cal.App.4th at p. 876.)  Thus, we analyze "whether it was 'objectively reasonable for the searching officer to believe that the person giving consent had authority to do so . . . .'  [Citation.]  What is objectively reasonable is a question of law, not fact."  (*Ibid.*)

    C.  *Analysis*

Defendant raises three arguments:  (1) because the trial court excluded his statement that he lived in the garage, the deputies lacked an objectively reasonable basis to believe that he had authority to consent to a search of the garage; (2) his consent, if given, was involuntary because it was tainted by the unlawful interrogation; and (3) his purported consent was involuntary because it was given while defendant was under arrest, detained in handcuffs, and surrounded by multiple armed deputies.

12

We need not reach the forfeiture argument raised by the Attorney General as to the first argument because defendant's claim clearly lacks merit.  At the hearing on the suppression motion, Deputy Lopez testified that he conducted a records check, which revealed that defendant lived at the address where he was subsequently found and arrested.  Moreover, Theresa described the residence to Lopez—she could not remember the address—including a specific vehicle that could be found in the driveway.  Theresa told Lopez that defendant lived in the garage.  Thus, although defendant's statement that he lived in the garage was suppressed, Lopez's records check and Theresa's description of defendant's address provided Lopez with an objectively reasonable basis for believing that defendant lived in the garage and had authority to consent to search the garage.

We also disagree with defendant's next argument, that his consent was involuntary because it was tainted by the unlawful interrogation that preceded the consent.  Defendant relies on three cases for the proposition that consent to search is involuntary where it directly follows from an inadmissible confession:  *People v. Rich* (1988) 45 Cal.3d 1036, *People v. Superior Court (Keithley)* (1975) 13 Cal.3d 406 (*Keithley*), and *People v. Superior Court (Corbett)* (2017) 8 Cal.App.5th 670.  None of these cases compel our agreement with defendant's contention here.

In *People v. Rich*, *supra*, 45 Cal.3d at pages 1079 to 1080, our Supreme Court concluded that the defendant's consent to search may have been tainted by his confession immediately preceding the consent.  In that case, the defendant confessed to multiple murders during an unlawful, almost two-hour interrogation, and at some point he consented to search of a car.  (*Id.* at pp. 1067, 1079.)  Recognizing that the record did not disclose the timing of the consent, the court concluded in a short discussion that consent would have been tainted by the confession if given after the confession, and consent would not have been tainted if given before the confession.  (*Id.* at p. 1079.)  The court concluded that, even if the consent were tainted by the confession, the evidence was properly admitted because it would have been inevitably discovered.  (*Ibid.*)

13

In *Keithley*, *supra*, 13 Cal.3d 406, the defendant received his *Miranda* warnings and stated he did not wish to discuss the case. The interrogation continued for another 30 minutes, tainting the defendant's subsequent statements, during which the defendant made a "highly incriminating remark concerning [the] offense." (*Id.* at pp. 409, 411.) A law enforcement officer also told the defendant that a search warrant could be obtained for his residence and informed him that his residence would be searched after a warrant was obtained. (*Ibid.*) The defendant then consented to the search. (*Id.* at p. 409.) The court recognized that continuing to interrogate the defendant after he stated he did not wish to discuss the case was a *Miranda* violation, but it observed that " '[c]onsent by the defendant, if "sufficiently an act of free will to purge the primary taint of the unlawful [interrogation]" [citation], may produce the requisite degree of "attenuation" ' " to remove the taint from evidence obtained directly as a result of unlawful police conduct. (*Id.* at p. 410.) However, the court noted that the trial court had suppressed the evidence, impliedly finding that the defendant's consent was not sufficiently an act of free will to purge the taint of the unlawful interrogation, and it concluded that the defendant's consent to search "may well have been influenced by knowledge he had already admitted involvement in the crime." (*Id*. at pp. 410-411.)

Finally, in *People v. Superior Court (Corbett)*, *supra*, 8 Cal.App.5th at page 681, the trial court concluded that the defendant did not meaningfully consent to search where " 'the officers overcame the defendant's willingness to resist' " following a lengthy interrogation. The trial court observed that the defendant " 'kept asserting his rights and [the officers] just kept on talking to him.' " (*Ibid.*) The appellate court affirmed the trial court's ruling that the defendant's consent was involuntary. (*Id*. at pp. 680-681.)

These three cases are distinguishable. Notably, they do not establish a bright-line rule that purported expressions of consent to search are necessarily invalid when they are tainted by an unlawful interrogation. As we have discussed, in *Keithley*, the court expressly recognized that a defendant's consent given pursuant to his free will could

purge the primary taint of an unlawful interrogation. (*Keithley*, *supra*, 13 Cal.3d at p. 410.)

Similarly, the trial court did not abuse its discretion when it found that defendant's expression of consent was voluntary here. The interrogation rendered unlawful by Deputy Lopez's failure to administer *Miranda* warnings consisted of only three questions—whether defendant lived in the garage, whether there were guns in the garage, and whether the deputies could search the garage. Defendant acknowledged that he lived in the garage (and that response was later suppressed), demonstrated his independence from Lopez's influence by *denying* that there was a gun in the garage, and then consented to the search. The trial court credited the evidence establishing that no deputy had their gun trained on defendant at the time he consented to the search.

We recognize that several of the *Ramirez* factors are present here. (See *People v. Ramirez*, *supra*, 59 Cal.App.4th at p. 1558.) Defendant consented while in custody without the benefit of *Miranda* warnings. The record is silent as to whether Deputy Lopez informed defendant that he had the right to refuse consent, and therefore we presume that Lopez did not so inform defendant. (But as the record is also silent as to whether Lopez told defendant that a search warrant could be obtained, we presume that Lopez did not.)

The presence of even several of the *Ramirez* factors does not necessarily render consent involuntary. (*People v. Monterroso* (2004) 34 Cal.4th 743, 758 [consent may be validly given where the defendant was arrested and in handcuffs, had not received *Miranda* warnings, and had not been informed of his right to withhold consent to search]; *People v. James*, *supra*, 19 Cal.3d at p. 110 [whether the defendant is under arrest and in handcuffs at the time of giving consent " 'is but one of the factors, but not the only one, to be considered by the trial judge who sees and hears the witnesses and is best able to pass upon the matter' "].) Rather than dispositive factors, these are each facts to be considered within the totality of the relevant circumstances. (*Monterroso*, at p. 758.) As

15

we have discussed, the interrogation here consisted only of three questions and defendant clearly demonstrated his free will by disagreeing with Lopez as to the second question, immediately before he gave consent.

Further, we disagree with defendant that his consent was rendered involuntary by the taint of the unlawful interrogation. We recognize that defendant's excluded admission that he lived in the garage was relevant to show that he possessed the ammunition charged in count two, but the effect of that answer was readily distinguishable from the effect of the confessions in *Keithley* and *Rich*, who admitted to actual crimes rather than simply admitting residence. Here, defendant had just denied the presence of a gun in the garage; thus, it does not follow that his consent to search was influenced by any prior confession. Nor is there any evidence that Lopez overcame defendant's willingness to resist, as was the case in *Corbett*, and therefore there is no basis upon which to conclude that defendant consented to search simply because his will had been worn down by the interrogation. Thus, we disagree with defendant that his consent was involuntary on the basis of the two unlawful questions asked immediately prior. The trial court did not abuse its discretion by concluding that defendant freely and voluntarily consented to search of the garage.

II

*Conviction for Unlawful Possession of Ammunition*

Defendant next contends there is insufficient evidence to support his ammunition possession conviction because the trial court suppressed his statement that he lived in the garage. We disagree.

A. *Standard of Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the

16

defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

B. *Legal Background*

To find guilt on the charge of unlawful possession of ammunition, the jury must find: (1) the defendant owned, possessed, or had under his custody or control ammunition; (2) the defendant knew they owned, possessed, or had under their control the ammunition; (3) the defendant was previously convicted of a felony; and (4) the previous conviction was within 10 years of the date the defendant possessed the ammunition. (CALCRIM No. 2591; § 30305, subd. (a)(1).) Possession of ammunition may be either actual or constructive. (*People v. Rushing* (1989) 209 Cal.App.3d 618, 621.) "Actual or constructive possession is the right to exercise dominion and control over the contraband or the right to exercise dominion and control over the place where it is found. [Citation.] Exclusive possession is not necessary. A defendant does not avoid conviction if his right to exercise dominion and control over the place where the contraband was located is shared with others." (*Id.* at p. 622.) But the mere opportunity of access to the place where the prohibited item is stored will not support a finding of unlawful possession without something more. (*People v. Kortopates* (1968) 264 Cal.App.2d 176, 179.) Ultimately, whether a defendant has custody or control over an item is determined by the totality of the evidence. (*Armstrong v. Superior Court* (1990) 217 Cal.App.3d 535, 539.) Possession may be established by circumstantial evidence and any reasonable inferences that can be drawn from that evidence. (*People v. Williams* (1971) 5 Cal.3d 211, 215.)

17

C. *Analysis*

First, there is substantial evidence that defendant spent a significant amount of time in the garage. Deputy Lopez testified that he researched defendant's address and concluded that defendant lived at Marshall's house, Theresa told Lopez that defendant lived in Marshall's garage, and employees of the group home often saw defendant's car parked in front of Marshall's house and believed he lived there. Marshall testified that defendant went to her house 20 to 22 days per month, spending most of his time in the garage. There was a working TV and refrigerator in the garage, a picture of defendant's daughter on the refrigerator, a sofa bed on which defendant acknowledged he sometimes slept, men's clothing, and other items of furniture. Visitors did not stay there. Defendant went to Marshall's house after his altercation with Theresa. Thus, whether or not Marshall's garage was defendant's *primary* residence, there was substantial evidence from which a rational juror could have concluded that defendant spent significant time in and had control over the garage.

Second, substantial evidence supports the finding defendant knew of and had control over the ammunition. Although he denied owning the ammunition and claimed it belonged to his deceased brother, he admitted that he was aware of its presence in the garage. Marshall testified that her deceased son owned a rifle and that she took control of rifle ammunition after his death, but she was equivocal about whether that son owned a handgun, and she was not aware of handgun ammunition or shotgun shells in the garage. Near the sofa bed where defendant sometimes slept, deputies found a small unlocked safe containing shotgun shells and multiple different calibers of ammunition. Deputies also found a nylon gun holster near the sofa bed. Additionally, Lopez's testimony established that Theresa told Lopez defendant possessed a semiautomatic handgun on the day Lopez searched the garage.

Defendant observes that the deputies did not find any firearm in his possession or ownership, his fingerprints were not on the ammunition, and both he and Marshall

18

testified that he did not live in the garage and that the ammunition belonged to his brothers. But the presence of evidence that the jury *could* have relied on to reach a contrary conclusion does not diminish the value of the evidence on which it evidently relied. The jury could have rationally inferred that defendant possessed the ammunition.

## III

### *Consolidation of the Charges*

Defendant contends the trial court abused its discretion and violated his constitutional rights to due process and a fair trial by consolidating the criminal threat and ammunition possession charges from August 2018 with the mayhem, battery, and assault charges (the mayhem case) from December 2018. He contends that he made a clear showing of potential prejudice by arguing that evidence of uncharged acts of domestic violence, intimate partner violence, and prior acts of gun and ammunition ownership would portray him as a violent person and undermine his claim of self-defense as to the mayhem case. We disagree.

A. *Procedural Background*

The prosecution charged defendant with the August offenses and the December offenses in separate cases before moving to consolidate, arguing that the offenses were factually connected and among the same general class of assaultive and battery crimes. Defendant objected to consolidation on the basis that the jury could impermissibly reason that if he committed the offenses on one occasion, he must have committed the offenses on the other. Following a hearing, the trial court granted the request to consolidate, finding "sufficient overlaps both in terms of witnesses and in terms of classification of crime" to support consolidation.

The trial court granted the prosecution's motion to permit evidence of defendant's prior uncharged acts of domestic violence and expert testimony regarding intimate partner abuse in conjunction with the criminal threat charge, but the court agreed to

19

instruct the jury that it could not consider the uncharged acts evidence with respect to the mayhem case.

### B. *Legal Background*

For purposes of judicial efficiency, the law prefers consolidation or joinder of charged offenses. (*People v. Merriman* (2014) 60 Cal.4th 1, 37 (*Merriman*).) Accordingly, section 954 authorizes the joinder of different offenses connected together in their commission or of different offenses of the same class. (*Merriman,* at p. 36.) The parties agree that joinder of the criminal threat and ammunition charges to the mayhem case was authorized by section 954 because the offenses were linked by "a common element of substantial importance," and therefore were "connected together in their commission." (See *People v. Anderson* (2018) 5 Cal.5th 372, 388.) Theresa was a witness to all of the alleged offenses, which all stemmed from defendant's relationship with her, the alleged offenses either occurred in or resulted from offenses occurring at the group home, and the criminal threat and assault counts each involved the intent to intimidate or terrorize the victim. (See *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1219 ["[T]he intent or motivation with which different acts are committed can qualify as a 'common element of substantial importance' in their commission and establish that such crimes were 'connected together in their commission' "].) We also agree with the trial court that joinder was appropriate because a criminal threat is in the same class of offense as mayhem, battery, and assault; all are crimes against the person. (See *Doe v. Saenz* (2006) 140 Cal.App.4th 960, 987 ["crimes against the person" generally refers to offenses in which the perpetrator uses or threatens to use force].)

However, even where joinder is authorized by section 954, as here, defendant may obtain severance of the properly joined charges by making "a clear showing of potential prejudice" due to the consolidation of the joined counts. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315.) On appeal from a judgment following the denial of a motion to sever, a defendant must show that the denial of severance was an abuse of discretion, or

20

that the resulting trial resulted in a denial of due process. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 408-409; *People v. Arias* (1996) 13 Cal.4th 92, 127.)

"Our framework for analyzing prejudice in this context is well established. 'Cross-admissibility is the crucial factor affecting prejudice. [Citations.] If evidence of one crime would be admissible in a separate trial of the other crime, prejudice is usually dispelled.' [Citation.] 'If we determine that evidence underlying properly joined charges would *not* be cross-admissible, we proceed to consider "whether the benefits of joinder were sufficiently substantial to outweigh the possible 'spill-over' effect of the 'other-crimes' evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses." ' [Citation.] Three factors are most relevant to this assessment: '(1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 299.) "In essence these are specific articulations of two broader variables: How likely is the spillover evidence to influence the jurors, and how susceptible is the charge to such influence? Once the spillover evidence has been identified and its potential to influence the verdict evaluated, the trial court must weigh the resulting risk of prejudice against the advantages of joint trials." (*People v. Earle* (2009) 172 Cal.App.4th 372, 388.) We review the trial court's decision to consolidate charges " 'in light of the showings then made and the facts then known.' " (*People v. Marshall* (1997) 15 Cal.4th 1, 27.)

"Even when we conclude . . . that the trial court acted well within its discretion in denying severance or consolidating charges, we must further inquire whether events *after* the court's ruling demonstrate that joinder actually resulted in 'gross unfairness' amounting to a denial of defendant's constitutional right to fair trial or due process of law." (*Merriman*, *supra*, 60 Cal.4th at p. 46.) "In determining whether there was such

gross unfairness, we view the case as it was tried, including a review of the evidence actually introduced in the trial." (*People v. Ybarra* (2016) 245 Cal.App.4th 1420, 1434.) "In other words, the defendant must demonstrate a reasonable probability that the joinder affected the jury's verdicts." (*People v. Grant* (2003) 113 Cal.App.4th 579, 588.)

C. *Cross-Admissibility of the Evidence in Separate Trials*

We first consider the issue of cross-admissibility. " '[T]he issue of cross-admissibility "is not cross-admissibility of the charged offenses but rather the admissibility of relevant evidence" that tends to prove a disputed fact. [Citations.]' [Citation.] Thus, . . . ' "complete (or so-called two-way) cross-admissibility is not required. In other words, it may be sufficient, for example, if evidence underlying charge 'B' is admissible in the trial of charge 'A'—even though evidence underlying charge 'A' may not be similarly admissible in the trial of charge 'B.' " ' " (*People v. Capistrano* (2014) 59 Cal.4th 830, 849, overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

Defendant argues that he made a clear showing of potential prejudice based on the introduction of evidence of his uncharged prior domestic violence, the expert witness testimony regarding "battered woman's syndrome," and the evidence of his prior gun and ammunition ownership. The parties agree that evidence would not have been admissible in a separate trial on the mayhem case.

The Attorney General contends that a significant amount of evidence admissible to prove the criminal threat and ammunition possession charges would have been cross-admissible in a separate trial on the mayhem case, such as the background of defendant's relationship with Theresa, his history at the group home, and the growing tensions caused by defendant's presence at the home. We recognize that the common witnesses and factual background here support consolidation to avoid " 'the waste of public funds which may result if the same general facts were to be tried in two or more separate trials.' " (*People v. Matson* (1974) 13 Cal.3d 35, 41.) But we must weigh the beneficial

22

results of joinder against the prejudicial effect of, as defendant argues, the other domestic violence, intimate partner abuse, and prior gun and ammunition possession evidence. Therefore, we proceed to consider whether the "spill-over" effect of that evidence was sufficiently substantial to outweigh the benefits of joinder. We conclude it was not.

D. *Inflammatory Nature of the Charges*

Defendant contends that the evidence from the other cases was particularly likely to inflame the jury against him in the mayhem case because the volume of that evidence might cause the jury to infer that defendant had a criminal disposition, making it less likely that the jury would accept his self-defense theory.

We note first that the conduct underlying the mayhem case is at least as offensive as the prior instances of domestic violence and gun and ammunition ownership. The latter included evidence that defendant dragged Theresa by her hair, pushed her to the floor, pushed her down the stairs, hit her in the arm with a wrench, and threatened her. Those acts are, at most, commensurate with the inflammatory nature of the conduct charged in the mayhem case -- running up the stairs to start a fight, punching another person repeatedly, and then biting off the person's finger.

Additionally, we do not agree with defendant that the sheer number of other acts was particularly likely to inflame the jury. Defendant relies upon *People v. Earle*, *supra*, 172 Cal.App.4th 372, and *Coleman v. Superior Court* (1981) 116 Cal.App.3d 129, but those cases are distinguishable. In *Earle*, the court concluded that evidence tending to brand the defendant as a " 'pervert' " may have caused the jury to convict him on the more serious sexual assault charge (*Earle*, at p. 401), and in *Coleman*, the court concluded that inflammatory evidence that the defendant was a child molester made it more likely that the jury would convict him of murdering an adult on the unrelated charge (*Coleman*, at pp. 138-139). Here, however, the other acts evidence is not inflammatory in the same way as is evidence tending to show that the defendant is a "pervert" or has a propensity for molesting children. Rather, while the other acts evidence tended to show

23

defendant had a history of domestic violence, as we have discussed, this evidence did not tend to show that defendant had any kind of sexual perversion that could inflame the jury, nor was it more inflammatory than the offenses charged in the mayhem case. Moreover, in both *Coleman* and *Earle*, the court focused on the fact that the evidence supporting the more serious crime subject to prejudice by the other acts evidence was based on circumstantial or questionable evidence (*Earle*, at p. 401; *Coleman*, at p. 138), which is not the case here.

E. *Joining a Strong Case with a Weak Case*

Based on the information before the trial court at the time it ruled on the severance motion, there was no basis on which to conclude that the evidence supporting the criminal threat and ammunition charges was significantly stronger than that underlying the mayhem case. There were eyewitnesses to each incident, and each count presented challenges for the prosecution. For example, it was anticipated that Theresa would testify inconsistently with her statement given to Deputy Lopez on the date of the incident, and the prosecutor would be required to prove that defendant owned the ammunition at issue in count two. With respect to the mayhem case, the prosecutor was required to disprove defendant's claim of self-defense. The two cases were of comparable strength.

Defendant points out that this factor is not limited to situations where the relative strengths of the cases are unequal. As our Supreme Court has stated, "our principal concern lies in the danger that the jury here would aggregate all of the evidence, though presented separately in relation to each charge, and convict on both charges in a joint trial . . . . The result might very well be that the two cases would become, in the jurors' minds, one case which would be considerably stronger than either viewed separately." (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 453-454.) Here, however, we conclude that the events at issue in this case are sufficiently separate so as to not give rise to a concern that the jury would aggregate all of the evidence. Additionally, while there existed a risk that the jury would conclude, based on the evidence of the criminal threat

24

and the ammunition, that defendant was more likely to have started the fight with T.J., rather than merely responding to T.J.'s provocation, the jury would have heard in the mayhem case that defendant was banned from the group home on the basis that a restraining order prohibited him from entering the home. The jury would also have heard evidence that defendant had threatened T.J. on multiple occasions before the fight.

Moreover, the jury's ability to consider each count on its individual merits is shown by its failure to reach a unanimous verdict on the criminal threat count. "Where the jury . . . fails to convict at all on some charges, we are confident the jury was capable of, and did, differentiate among defendant's crimes." (*People v. Jones* (2013) 57 Cal.4th 899, 927.)

F. *Capital Offenses*

Defendant was not charged with any capital offenses, and joining the charged crimes did not convert the case to a capital one. This factor, then, weighs against any prejudice in trying the charged offenses jointly. (Cf. *Williams v. Superior Court* (1984) 36 Cal.3d 441, 454 [a case in which "it is the joinder *itself* which gives rise to the special circumstances allegation of multiple murder"].)

G. *Violation of Due Process*

Defendant contends that the evidence presented at trial violated his constitutional rights to due process and a fair trial due to the likelihood that "spillover" of the actual evidence of prior instances of domestic violence, expert testimony regarding intimate partner abuse, evidence of Theresa's 911 calls made on August 28, and testimony regarding defendant's gun and ammunition ownership, and the prosecutor's argument that defendant consistently engaged in domestic violence against women and possessed ammunition.

However, the evidence supporting the various charges was simple and distinct. (*People v. Soper* (2009) 45 Cal.4th 759, 784 [no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even if such evidence might not have been

admissible in separate trials].)  The conduct leading to the charges occurred on two separate dates and involved two different victims.  Additionally, as we have discussed, the jury's failure to reach a verdict on the criminal threat count demonstrates that the jury considered each count on its individual merits.  (*People v. Jones, supra*, 57 Cal.4th at p. 927.)  Indeed, the evidence of defendant's prior instances of uncharged domestic violence was likely to have had the greatest effect on the jury with respect to the criminal threat count, in which defendant was accused of threatening his wife.  Had the jury been so influenced by the volume of evidence of defendant's uncharged instances of domestic violence, as defendant now contends, the jury would likely have found him guilty of committing a criminal threat.  It did not.

Finally, we recognize that the trial court minimized any potential prejudice by instructing the jury to consider each charged offense separately and to consider the prior acts evidence only in relation to the criminal threat charge.  The court further instructed the jury not to conclude from this evidence that defendant had a bad character or was disposed to commit a crime.  The jury is presumed to have followed these instructions.  (*Merriman*, *supra*, 60 Cal.4th at pp. 48-49.)  The prosecutor also referenced this limiting instruction in closing argument.  Defendant has failed to show that joinder actually resulted in gross unfairness amounting to a denial of his constitutional right to fair trial or due process of law.

IV

Marsden *and New Trial Motions*

Defendant contends the trial court erred by denying his *Marsden* motion to substitute appointed counsel or his motion for new trial; he argues trial counsel's failure to review or introduce photographs of his injuries violated his constitutional rights to a fair trial and effective assistance of counsel.  We disagree.

A.  *Procedural Background*

On May 3, 2019, at the close of evidence, defendant moved to substitute his appointed counsel pursuant to *Marsden*.  Defendant asserted that he had provided counsel with photographs of his facial injuries resulting from his fight with T.J., but counsel did not admit the photographs into evidence at trial.  Following an in camera hearing, the trial court denied the *Marsden* motion.

On May 31, 2019, at sentencing, defendant again moved to substitute counsel on the basis that he had provided counsel with photographic and other video evidence of his injuries.  In an in camera hearing, counsel acknowledged that defendant had given him a thumb drive before trial, but he was unable to open it, and his investigator was unable to contact defendant.  Counsel also stated that he had reviewed another photograph of defendant's nose taken on the day of the fight, and he asserted:  "[Defendant's] nose was not torn.  It was not -- it looked like he had been in a fight maybe, and there was a little bit of blood coming -- you could see a little bit of blood come down the nostrils, but his nose was not damaged in any way."  Counsel stated that he elected to not use the photograph because he concluded the photograph would detract from defendant's and Theresa's testimony that T.J. was tearing at defendant's nose.  The court continued the proceeding to allow counsel to obtain a copy of the photographs.

At the continued hearing on July 26, 2019, counsel produced 14 photographs showing injuries that defendant sustained in the fight with T.J.  Counsel stated that he was unaware of the photographs at the time of trial because he had misplaced the thumb drive defendant had given him and confused it for another drive that he was unable to open.  Counsel again noted that some of the photographs depicted a "scrape" and a "nick" to defendant's face and nose, but acknowledged that he would have introduced the photographs had he known about them because they corroborated defendant's, Theresa's, and Saleen's testimony that T.J. used his fingers to "wrench[ ] up on [defendant's] nose."

27

Without opining on the merits of a new trial motion, the trial court recognized that the photographs presented a basis for the defense to file it. The court denied defendant's *Marsden* motion on the basis that counsel's failure to access the photographs was "a completely inadvertent and understandable, if regrettable, slipup." The court concluded that counsel would be able to represent defendant in a motion for new trial and that defendant could renew his *Marsden* motion at a later time if he wished to do so.

Counsel filed a motion for new trial based on newly discovered evidence; he attached the photographs of defendant's injured face and declared they depicted "torn skin" consistent with being scratched with a fingernail, which corroborated the defense that T.J. was "clawing and tearing upward on defendant's nose." Counsel further argued that the evidence could have affected the jury's determination of the aggressor in the fight. Counsel recognized that the trial court concluded his failure to present the evidence was due to "understandable forgetfulness, or excusable neglect," and asserted that he would have introduced the evidence had he remembered to get the photographs from defendant.

The trial court ruled that the evidence was not newly discovered because it was known to defendant and "nominally" known to counsel prior to trial.

Although not argued in the new trial motion, the trial court proceeded to analyze whether counsel was constitutionally ineffective for failing to introduce the photographs. The court observed that the 14 photographs were almost entirely cumulative in that they showed "a small cut on the left nostril, the outer flange," and it reiterated that the cut was "very small." The court concluded that defendant did not suffer prejudice because there was not a reasonable probability of a different outcome had the photographs been introduced at trial. It observed that counsel's advocacy was vigorous, albeit imperfect due to his failure to introduce the photographs, and the photographic evidence would not have affected the result because defendant's injury as shown in the photographs was not significant, only showed that defendant's nose "was involved in the event"--which was

not disputed at trial--and the photographs showed injuries that were consistent with the testimony of T.J. and defendant. Accordingly, the court concluded counsel was not constitutionally ineffective for failing to introduce the photographs, and it denied defendant's motion for new trial.

B. Marsden

Under *Marsden*, a defendant is entitled to substitute counsel if the record clearly shows that appointed counsel is not providing constitutionally adequate representation such that his constitutional right to counsel would be substantially impaired, or the defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation will likely result. (*People v. Taylor* (2010) 48 Cal.4th 574, 599.) The inquiry into whether appointed counsel is providing constitutionally adequate representation "is forward-looking in the sense that counsel would be substituted in order to provide effective assistance in the *future*. But the decision must always be based on what has happened in the *past*." (*People v. Smith* (1993) 6 Cal.4th 684, 695.)

To establish inadequate representation, a defendant must first show his or her attorney's representation fell below an objective standard of reasonableness under prevailing professional norms and, second, that he or she was prejudiced as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) " '[P]rejudice must be affirmatively proved; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*People v. Hart* (1999) 20 Cal.4th 546, 623-624.) If either element of the ineffective assistance of counsel analysis has not been proven, the defendant's claim of ineffective assistance fails. (*Strickland*, at p. 697.)

" '[T]he decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney.' " (*People v.*

*Smith, supra*, 6 Cal.4th at p. 690.) Thus, "[w]e review the denial of a *Marsden* motion for abuse of discretion. [Citation.] Denial is not an abuse of discretion 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' " (*People v. Taylor*, *supra*, 48 Cal.4th at p. 599.)

Here, defendant argues that the trial court abused its discretion by denying his *Marsden* motion to substitute counsel because "there was an obvious conflict of interest in having him continue to represent [defendant]" once counsel had admitted his failure to introduce the photographs, and the court should not have permitted him to argue his own ineffectiveness in a new trial motion. However, defendant recognizes that he must show prejudice, and he recognizes that the test for prejudice is similar to the test for prejudice in reviewing the trial court's ruling on defendant's motion for new trial, which we discuss *post*. Accordingly, we proceed to analyze the lack of prejudice to defendant in the context of the trial court's denial of his motion for new trial.

C. *New Trial*

There is a two-step process to review the denial of a motion for a new trial based on purported ineffective assistance of counsel. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.) First, we review the trial court's express or implied factual findings for substantial evidence; "all presumptions favor the trial court's exercise of its power to judge the credibility of witnesses, resolve any conflicts in testimony, weigh the evidence, and draw factual inferences." (*Id.* at p. 724.) Second, we review de novo the trial court's determination of whether the defendant has shown counsel was ineffective or whether he suffered prejudice as a result of counsel's alleged failings. (*Id.* at pp. 724-725.) We set forth the standard for establishing a claim of ineffective assistance of counsel *ante*.

We conclude that defendant has failed to show prejudice. Substantial evidence as well as a review of the photographs provided as part of the record on appeal support the trial court's findings that the photographs showed a very small cut on defendant's nose,

30

that defendant's nose "was involved in the event," and showed only injuries consistent with the testimony of defendant and T.J. T.J. testified that he returned punches when defendant hit him, and he tried to restrain defendant by putting him in a headlock. T.J. also testified that he, defendant, and Theresa all fell down the stairs when Theresa attempted to intervene. The photographic evidence demonstrated injuries consistent with having been in a fistfight, with T.J. having attempted to subdue defendant by putting him in a headlock, or with the participants falling down the stairs. Thus, substantial evidence supported the trial court's findings that the photographs only showed injuries consistent with both the defense and prosecution evidence.

Substantial evidence also supports the trial court's finding that counsel's advocacy was vigorous. Counsel diligently pursued the theory that defendant acted in self-defense and his specific allegation that T.J. scratched and clawed at defendant's face. Defendant testified that T.J. pushed him against the wall with his finger in defendant's mouth and nose, and was tearing up his nose, eye, and skin. Theresa testified in support that T.J. tried to "rip [defendant's] eyeballs," grabbed and pulled defendant's nose, and "stretch[ed] [defendant's] face out." Saleen testified that T.J. held defendant by the throat against the wall, punched him four or five times, and pulled on his face. Based on the trial court's findings, supported by substantial evidence, that the photographic evidence showed only a very slight injury to defendant and was consistent with the evidence from both the prosecution and defense, and that counsel provided vigorous representation, we conclude that defendant has failed to show prejudice. Therefore, his claim of ineffective assistance fails.

Defendant asserts that counsel was ineffective because he based the new trial motion on the "far-fetched" theory of newly discovered evidence, rather than ineffective assistance of counsel. But as defendant recognizes, the trial court analyzed whether counsel provided ineffective assistance, and it rejected that argument. Thus, no prejudice appears.

Defendant contends that he need not show prejudice to demonstrate ineffective assistance of counsel; he points to our Supreme Court's recognition that a defendant may demonstrate ineffective assistance of counsel by showing that, " '[a]s a result of counsel's performance, the prosecution's case was not subjected to meaningful adversarial testing, in which case there is a presumption that the result is unreliable and prejudice need not be affirmatively shown.' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 982.) Similarly, a defendant need not establish prejudice when counsel's incompetence deprived him of a "potentially meritorious defense." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581-583.) However, we conclude these principles are inapplicable here. There is nothing to suggest that counsel's failure to present the photographic evidence constituted such deficient performance as to fail to subject the prosecution's case to meaningful adversarial testing. Additionally, as we have discussed, there is no presumption of unreliability here; counsel's failure to present the photographs did not deprive defendant of a potentially meritorious defense, as his defense was more than adequately presented.[2]

V

*Assault, Battery, and Mayhem Offenses*

Defendant was charged with, and the jury found him guilty of, one count of mayhem (§ 203; count three), battery resulting in serious bodily injury (§ 243, subd. (d); count four), and assault likely to produce great bodily injury (§ 245, subd. (a)(4); count five), all arising out of the same incident. The court imposed the sentence for mayhem and imposed but stayed execution of punishment on the battery and assault convictions pursuant to section 654. Defendant now contends that his battery and assault convictions must be vacated because they are different statements of the same offense as his mayhem

---

[2] Because we conclude that the trial court made no errors, we reject defendant's claim of cumulative error. (See *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068 ["A predicate to a claim of cumulative error is a finding of error"].)

32

conviction, rendering conviction for those offenses barred under section 954 and the double jeopardy clauses of the federal and state Constitutions.  We disagree.

Section 954 allows multiple convictions for different or distinct offenses based on the same act or course of conduct.  (*People v. Vidana* (2016) 1 Cal.5th 632, 649 (*Vidana*).)  The statute explicitly permits the charging of "two or more different offenses connected together in their commission, or different statements of the same offense." (§ 954.)  "The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged."  (*Ibid*.)

Despite the seemingly absolute language of section 954, there are two judicially created exceptions.  First, multiple convictions may not be based on necessarily included offenses.  (*In re Jose H.* (2000) 77 Cal.App.4th 1090, 1094-1095.)  Second, section 954 does not permit multiple convictions for a *different statement of the same offense* based on the same act or course of conduct.  (*Vidana*, *supra*, 1 Cal.5th at p. 650 [multiple convictions for larceny (§ 484, subd. (a)) and embezzlement (§ 503) prohibited because statutes provide different elements for the same offense; Legislature provided that statutes referring to "larceny," "embezzlement," and "stealing" shall be interpreted as if the word "theft" were substituted (*Vidana,* at pp. 648-649)].)  Whether statutory provisions "define different offenses or merely describe different ways of committing the same offense properly turns on the Legislature's intent in enacting these provisions, and if the Legislature meant to define only one offense, we may not turn it into two." (*People v. Gonzalez* (2014) 60 Cal.4th 533, 537.)

Neither judicially created exception applies here.  The parties agree that the three crimes at issue—mayhem, battery resulting in serious bodily injury, and assault likely to produce great bodily injury—where they arise out of the same incident are *not* necessarily included in one another.  (*People v. Santana* (2013) 56 Cal.4th 999, 1009-1010; *People v. Poisson* (2016) 246 Cal.App.4th 121, 124-125.)  Nor does defendant

33

argue that his convictions for assault, battery, and mayhem were *different statements of the same offense*. Rather, defendant argues only that his convictions for assault and battery must be vacated because they were all charged and prosecuted for *the same conduct*. But as we have described, " 'California law prohibits convicting a defendant of two offenses arising from a single criminal act when one is a lesser offense necessarily included in the other.' " (*Poisson*, at p. 124.) Section 954 does *not* prohibit conviction of *multiple different offenses* arising out of the same conduct. (*Vidana*, *supra*, 1 Cal.5th at p. 650; *People v. Gonzalez*, *supra*, 60 Cal.4th at p. 537.) In the absence of any argument that the offenses of assault, battery, and mayhem are different descriptions of the same offense, we conclude defendant's argument lacks merit. Indeed, there is no indication that the three offenses are separate descriptions of the same offense; each offense has its own Penal Code section, the elements of each offense are materially different on their face, and the offenses vary in punishment. (*Gonzalez*, at pp. 536-539.) We also reject defendant's argument that convictions for assault, battery, and mayhem violate the constitutional prohibition against double jeopardy because the offenses are not included in one another and are not descriptions of the same offense. (See *People v. Kelley* (1997) 52 Cal.App.4th 568, 576 [double jeopardy clause prohibits an individual from being tried twice for the same offense or any included offense].)

Defendant was properly convicted of these three charges; his claim to the contrary lacks merit.[3]

---

[3] Defendant contends that his on-bail enhancement must be vacated if we reverse the convictions on either of his cases. Because we have rejected all claims of error, we do not vacate the on-bail enhancement.

## VI

*Assembly Bill No. 518 and Senate Bill No. 567*

Before oral argument, defendant filed a notice of new authorities (Cal. Rules of Court, rule 8.254(a)), which authorizes a party to inform the court by letter of "new authority, including new legislation, that was not available in time to be included in the last brief that the party filed or could have filed."  Defendant's notice informed the court of two pieces of new legislation that became effective January 1, 2022, well after defendant's reply brief was filed on November 19, 2021.  Recognizing that defendant's notice did not concern issues defendant had raised on appeal, at oral argument we agreed to treat defendant's notice as a supplemental brief, to allow the Attorney General to file a response brief, and to allow defendant to file an optional reply brief.  In his respondent's brief, the Attorney General agreed that the new legislation applies retroactively in defendant's case, and, as we will explain, we agree with the parties that we must remand the matter to the trial court for resentencing.

A.  *Assembly Bill No. 518*

At the time defendant was sentenced, former section 654, subdivision (a) provided:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Stats. 1997, ch. 410, § 1.)  Assembly Bill No. 518 amended section 654 to allow trial courts to exercise discretion in choosing the count for which it will impose punishment, rather than requiring imposition of the longest potential term of imprisonment.  (Stats. 2021, ch. 441, § 1.)  Section 654, subdivision (a) now provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions . . . ."  Because defendant's case is not yet final, he is entitled to the benefits of amended section 654 pursuant to the principles of retroactivity established in *Estrada.*  (*In re Estrada* (1965) 63 Cal.2d 740; *People v.*

*Mani* (2022) 74 Cal.App.5th 343, 379.) Accordingly, we shall remand for the trial court to exercise its discretion in deciding which terms to stay pursuant to section 654 as amended.

B. *Senate Bill No. 567*

Defendant further contends that he should be resentenced under Senate Bill No. 567. (Stats. 2021, ch. 731, § 1.3.) Under Senate Bill No. 567, the trial court must impose a term of imprisonment not exceeding the middle term unless (1) aggravating circumstances have been established by stipulation or found true beyond a reasonable doubt at trial, or (2) the defendant has suffered prior convictions as established by certified records. (§ 1170, subd. (b).) The new law generally allows for a bifurcated trial on these aggravating circumstances. (§ 1170, subd. (b)(2).)

The Attorney General conceded at oral argument that the statutory changes in Senate Bill No. 567 apply retroactively to this case (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039), but due to his acknowledgement that remand is appropriate to resentence defendant pursuant to Assembly Bill No. 518, he declined to address the application of Senate Bill No. 567 to defendant's sentence.

On remand, the trial court will have the opportunity to apply section 1170, subdivision (b) as amended to impose the appropriate sentence on both stayed and unstayed terms.

## DISPOSITION

Defendant's convictions are affirmed. The sentence is vacated, and the case is remanded to the trial court to exercise its discretion in deciding which terms to stay pursuant to section 654 (as amended by Stats. 2021, ch. 441, § 1), and to impose terms of imprisonment consistent with section 1170, subdivision (b) (as amended by Stats. 2021, ch. 731, § 1.3). If the court imposes a different sentence than that imposed at the initial sentencing, it is directed to prepare an amended abstract of judgment and to forward a certified copy thereof to the Department of Corrections and Rehabilitation.

_____/s/_____
Duarte, Acting P. J.

We concur:

_____/s/_____
Renner, J.

_____/s/_____
Krause, J.